AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

| | |
|---|---|
| United States of America<br>v.<br><br>DEREK SCOTT FINKBEINER,<br>aka Scott Finkbeiner,<br>JORDAN HAMMOND, &<br>████████████<br><br>*Defendant(s)* | )<br>)<br>)  Case No.    6:25-MJ-06002-BAB<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of  __May to December of 2024__  in the county of  __Hot Spring and elsewhere__  in the

__Western__  District of  __Arkansas__ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| - 18 U.S.C. 1512(b)(1) & (k)<br>- 18 U.S.C. 2 & 1512(b)(1)<br>- 18 U.S.C. 3147(1) | - Conspiracy to Tamper with a Witness (All Three Defendants)<br>- Tampering with a Witness, Aiding & Abetting (All Three Defendants)<br>- Commission of a Federal Felony Offense while on Pre-Trial Release<br>(Defendant Finkbeiner Only) |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

/s/ Brian Ambrose (telephonically)

*Complainant's signature*

BRIAN AMBROSE, Special Agent, FBI

*Printed name and title*

Sworn to before me and signed in my presence.

Date:  __2-6-25__

City and state:  __Texarkana__ , Arkansas

BARRY A. BRYANT, U.S. Magistrate Judge, WDAR

*Judge's signature*

*Printed name and title*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **Case No.** ___6:25-MJ-06002-BAB |
| **v.** | ) | |
| | ) | **FILED UNDER SEAL** |
| **DEREK SCOTT FINKBEINER** | ) | |
| **aka Scott Finkbeiner,** | ) | |
| **JORDAN HAMMOND, &** | ) | |
| ███████████ | ) | |
| | ) | |

## AFFIDAVIT

I, Brian Ambrose, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), hereby depose and state that the following is true and correct upon my personal knowledge, investigation, and belief.

### BACKGROUND & AFFIANT EXPERIENCE

1.     I am a Special Agent of the Federal Bureau of Investigation, United States Department of Justice. I am an "Investigative or law enforcement officer . . . of the United States" within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to conduct investigations of and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.     I have been employed as a Special Agent of the FBI since March 2018. I am currently assigned to the Little Rock Division's White Collar Crime Squad, with the responsibility of leading investigations involving public corruption of domestic public officials. I have also served as a member of the Special Weapons and Tactics (SWAT) team for approximately five years, and in connection with those responsibilities have participated in large-scale arrests of drug trafficking and violent offenders. In connection with my official duties, I am charged with

1

investigating violations of federal criminal laws. I have received training in narcotics enforcement, money laundering, violent crimes, and asset forfeiture.

3.     During my time as a law enforcement officer, I have participated in numerous investigations of unlawful narcotics distribution, public corruption, firearms violations, and violent crime, including gang activity and crimes against children. My experience encompasses both domestic and extraterritorial investigations including multi-agency, multi-government efforts focused on disrupting international criminal organizations conducting large scale narcotics trafficking, money laundering and other illicit activities. I have been involved in all aspects of federal criminal investigations, including, among other things, debriefing defendants, sources, witnesses and informants; conducting surveillance and undercover operations; executing search and seizure warrants; reviewing Call Detail Records, monitoring Title III wiretaps; and analyzing documentary and physical evidence. I have been tasked with operating multiple Confidential Human Sources. Through my training, education, and experience, I have become familiar with the manner in which illegal drugs are transported, stored, distributed, and the methods of payments for such drugs.  I am also familiar with the methods by which narcotics traffickers communicate and the code words commonly used by narcotics traffickers. I am also familiar with the manner and methods by which drug dealers launder their proceeds of illicit drug trafficking and distribution, as well as their use of firearms to protect themselves, their proceeds, and their drugs. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there
is probable cause to believe that violations of federal law, as listed below, have been committed
by Derek Scott FINKBEINER, aka Scott Finkbeiner ("FINKBEINER"), Jordan HAMMOND
("HAMMOND"), and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.     The suspected violations
are as follows:

   a.  Title 18, United States Code, Sections 1512(b)(1) and 1512(k) (Conspiracy
       Tampering with a Witness); and

   b.  Title 18, United States Code, Section 1512(b)(1) (Tampering with a Witness).

5.     Further, based on my training and experience and the facts as set forth in this
affidavit, there is probable cause to believe that FINKBEINER was subject to the provisions of
Title 18, United States Code, Section 3147, during the course of the commission of the violations
of Title 18, United States Code, Section 1512 outlined above.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of
competent jurisdiction" as defined by Title 18, United States Code, Section 2711. Specifically,
the Court is a District Court of the United States that has jurisdiction over the offense(s) being
investigated as defined by Title 18, United States Code, Section 2711(3)(A)(i).

## PROBABLE CAUSE

## I.     FINKBEINER PROCEDURAL HISTORY

7.     On November 13, 2024, a Grand Jury for the Western District of Arkansas returned
a True Bill as and against FINKBEINER and a Second Superseding Indictment[1] was issued in the
matter of *United States of America v. Derek Scott Finkbeiner, aka Scott Finkbeiner,* 6:23CR-60039-

---

[1] The original Indictment (Doc. 16) was issued on or about November 15, 2023. The Superseding Indictment
was issued on July 31, 2024. (Doc. 67).

001 (W.D. Ark November 13, 2024) (Doc. 97)[2]. The Second Superseding Indictment[3] alleges six
(6) counts, as follows:

  a. Count One – Being an Unlawful User of a Controlled Substance in Possession of
     Firearms, in violation of Title 18, United States Code, Sections 922(g)(3) and
     924(a)(8):

  b. Count Two – Engaging in a Scheme to Conceal a Material Fact, in violation of Title
     18, United States Code, Section 1001(a)(1);

  c. Count Three – False Statement, in violation of Title 18, United States Code, Section
     1001(a)(2);

  d. Count Four – False Statement, in violation of Title 18, United States Code, Section
     1001(a)(2);

  e. Count Five – Misprision of Title 21, United States Code, Section 841(a)(1)
     (Distribution of a Controlled Substance), in violation of Title 18, United States
     Code, Section 4; and

  f. Count Six – Misprision of Title 21, United States Code, Sections 856(a)(1) and (b)
     (Maintaining a Drug-Involved Premises), in violation of Title 18, United States
     Code, Section 4.

(7)    FINKBEINER was originally arrested pursuant to a Federal Complaint and placed
on certain pre-trial release conditions. These conditions are outlined by the Court's Order Setting
Conditions of Release (Doc. 13) and were incorporated into the subject case upon filing of the
original Indictment (Doc. 16).

---

[2] All citations utilizing the format "Doc." reference back to the documents and pleadings filed in *U.S. v. Finkbeiner,* Case Number 6:23CR-60039-001, Western District of Arkansas.

[3] The Second Superseding Indictment differs from the Superseding Indictment only in the order of the charged Counts and one (1) serial number of a firearm listed in Count One. (Doc. 97).

9.     On or about December 11, 2023, the Court entered an Order (Doc. 34) modifying the conditions of FINKBEINER's pre-trial release, which, among other things, affirmed that the conditions imposed in the original Order Setting Conditions of Release (Doc. 13) were to remain in full force and effect. Specifically, the Court's modification Order states as follows: "All other conditions of release not modified herein shall remain in full force and effect." (Doc. 34).

10.    As part of the original pre-trial release conditions imposed by the Court, FINKBEINER was ordered to "avoid all contact, directly or *indirectly,* with any person who is or may be a victim or *witness* in the investigation or prosecution[.]" (Doc. 13, para. 7(g)) (emphasis added). The Court's modification Order did not modify or otherwise set aside this no contact provision. (Doc. 34).

11.    Additionally, the Order Setting Conditions of Release specifically advised FINKBEINER that "[w]hile on release, if you commit a federal felony offense the punishment is an additional prison term of not more than ten years . . .." (Doc. 13). The Order goes on to state that "[t]his sentence will be consecutive (*i.e.*, in addition to) any other sentence you receive." *Id.* FINKBEINER signed the Order, otherwise acknowledging that he was "aware of the penalties and sanctions set forth above." *Id.*

12.    Based on information and belief, FINKBEINER was subject to and restricted by the conditions outlined in both the Court's original Order Setting Conditions of Release (Doc. 13) and the Court's modification Order (Doc. 34) at the time of the commission of the alleged offenses herein.

13.    On or about December 11, 2023, the Court entered its Protective Order Governing Discovery. (Doc. 35). The Protective Order Governing Discovery placed the following provisions

5

and restrictions, among others, in relation to the dissemination of any discovery materials provided
to FINKBEINER by the government:

      a. *Any and all discovery materials produced to the Defendant shall be reviewed only
by the (i) Defendant, (ii) counsel of record for the Defendant, (iii) employees of
such attorney(s), (iv) a photocopying or data processing service to whom it is
necessary that the Defendant show the materials for the purposes of preparation,
trial, direct appeal (if any), and collateral attack (if any) of this matter* (Doc. 35,
para. 1)*;*

      b. *The Defendant shall not retain the materials or their duplicates* (*Id.,* para. 2)*;*

      c. *The Defendant and their counsel shall use the discovery materials and their
contents solely for the preparation, trial, direct appeal (if any), and collateral
attack (if any) of this matter, and for no other purposes* (*Id.,* para. 3)*;*

      d. *The substance of any discovery materials provided to, or made available for review
by defense counsel, shall not be disclosed or related to any person other than (i)
the Defendant, (ii) counsel of record for the Defendant, (iii) employees of such
attorney(s), (iv) a photocopying or data processing service to whom it is necessary
that the defense counsel show the materials for the purposes of preparation, trial,
direct appeal (if any), and collateral attack (if any) of this matter* (Id., para. 3)*; and*

      e. *The Defendant shall treat personal identifying information from discovery as
"constructively redacted" and shall not use or disseminate such information
without agreement from the Government or approval from the Court* (Doc. 35, para.
6)*.*

6

14.     Based on information and belief, FINKBEINER was subject to and restricted by the conditions outlined in the Court's Protective Order Governing Discovery (Doc. 35) at the time of the commission of the alleged offenses herein.

## II.    CONTENT OF JAIL CALLS AND PHONE CALL LOGS

15.     According to voluntary statements made by HAMMOND in a recorded interview with the FBI on September 16, 2024, HAMMOND met FINKBEINER while he was the Hot Spring County Sheriff, but prior to his arrest. HAMMOND began working construction with FINKBEINER in 2024, after his arrest. Multiple witnesses indicated to the FBI that HAMMOND and FINKBEINER are close friends. Analysis of tolls from their respective phones shows that the two (2) were in frequent contact with one another.

16.     ▮▮▮▮▮ was incarcerated at the Grant County Detention Center / Sheridan City Jail during a portion of the time covered by this Complaint Affidavit. As a result, his phone calls placed from the Sheridan City Jail were recorded. A review of the recorded calls between HAMMOND and▮▮▮▮ from March of 2024 to May of 2024 suggests that they were also close associates.

17.     Quotations from the recorded jail calls cited in this affidavit, include statements made by ▮▮▮▮▮, HAMMOND and the husband (WI's Husband) of a witness (Witness 1, hereafter W1[4]) that reference FINKBEINER in multiple ways, including: "Finkbeiner," "Scott", "he," "Mr. Good Guy," and "our friend." As both▮▮▮▮ and HAMMOND referenced that their conversations were being recorded on the jail calls, it is this affiant's assessment that FINKBEINER was intentionally referenced using general pronouns or code names by both parties.

---

[4] Witness 1 is a witness in the pending federal case against FINKBEINER. Based on information and belief, FINKBEINER would be and is aware of Witness 1's true name and identity through the discovery process.

18.     Based on this affiant's training and experience, individuals communicating on a recorded line, especially through jail calls, often intentionally use vague pronouns and code names to conceal the identity of a referenced party from anyone listening. Additionally, references to FINKBEINER cited in quotations are based on context established through review of the entire body of recorded phone calls captured between March 29- May 12, 2024 as well as the volume, time, and duration of calls between HAMMOND's Phone and FINKBEINER's Phone reflected in Toll Records.

19.     FINKBEINER relinquished much of his authority as the elected Hot Spring County Sheriff based on his acceptance of pre-trial release conditions following his arrest in November 2023. It is this affiant's assessment that, even though FINKBEINER was the Sheriff in name at the time of writing, statements made by HAMMOND and ▮▮▮ on recorded jail calls referencing "when he's back in office," or "he's gotta get back," or "back into play" refer to him returning to his elected office without restriction to his authority.

20.     In March 2024, ▮▮▮ was detained in Sheridan City Jail/Grant County Detention center. From March 2024 through May 2024, ▮▮▮ and HAMMOND exchanged 146 recorded jail calls. During these calls, HAMMOND discussed FINKBEINER, conversations she has had with FINKBEINER, and references assurances and/or a perceived stream of benefits ▮▮▮ could receive in exchange for compromising information on law enforcement officers, or names of women that would be willing to testify to help FINKBEINER on his case. Below are examples of conversations of this nature between HAMMOND and ▮▮▮.

a. **MARCH 29, 2024**

  i. **Hammond:** *I talked to Finkbeiner, tell what it is that you know, that he might not already know..."*

8

ii.  ▮ : *About him like fucking, fucking bitches in drug court?*

iii.  **Hammond:** *Him?*

iv.  ▮ : *Who, about, Finkbeiner or* ▮ *?*

v.  **Hammond:** *Oh,* ▮ *,* ▮ ▮ .

vi.  ▮ : *So who do you need, so you're talking about Finkbeiner?*

vii.  **Hammond:** *Yeah, but not something on him, something on somebody else like* ▮ *or one of the fucking… It has to be a law official, it can't be, you know what I mean, just somebody. It has to be somebody in a fucking, you know what I mean. Like* ▮ *, or* ▮ *, or* ▮ *… it has to be a fucking law enforcement person. Somebody like, how anybody's that trying to get to him, you'd have to have something on him.*

viii.  ▮ *: I got shit on all of them.*

ix.  **Hammond:** *Do you? Well then, fucking, tell him something he doesn't know and he'd be happy to do it.*

x.  ▮ : *I got the homegirl that that was like fucking like* ▮ *, and fucking, fucking with* ▮ *and all these motherfuckers and to that day she still is, you know what I mean? And she's willing to do like whatever the fuck I tell her to do.*

xi.  **Hammond**: *I've got one already that's doing that too…Will she be willing to… whatever? Like testify, would she be willing to testify?*

xii.  ▮ : *Fuck yeah, she would be willing to testify.*

b.  **MARCH 30, 2024**

9

      i. **Hammond:** *Hey, so I talked to him today, Finkbeiner, and he said uh, if you know, I need to, he needs to know the names of the girls, cuz like I already got* ▓▓▓*, you know what I mean, and you know* ▓▓▓ *and* ▓▓▓*, but if you got anybody else he needs to know who they are and he's gonna do whatever.*

    21.    On May 12, 2024, while incarcerated in Sheridan City Jail, ▓▓▓ made a recorded call to HAMMOND, phone number ▓▓▓, at 10:59am. Early in the call, HAMMOND referenced FINKBEINER and said that he would testify for ▓▓▓ after FINKBEINER is back in office in exchange for making contact with someone named "▓▓▓."

    a. **Hammond:** *When I talked to Scott yesterday, he said um, he said, you know, you know, if we can get* ▓▓▓ *and all that other stuff to do that, you know what I mean, when he's back in office, that he can come and testify for you at your trial.*

    22.    In the same call, ▓▓▓ notified HAMMOND that he was currently incarcerated with the husband of the girl *"that got Scott,"* W1, and indicated that she would be willing to testify that she was being forced to *"do shit."* The call was then disconnected.

    a. ▓▓▓**:** *Listen, the girl that that got Scott?*

    b. **Hammond:** *That got what?*

    c. ▓▓▓**:** *The one that got Scott?*

    d. **Hammond:** *What do you mean? None of them got him.*

    e. ▓▓▓**:** *In like, in supposedly in a motel room or something like that a long time ago?*

    f. **Hammond:** *Oh yeah, yeah, yeah, allegedly, yeah.*

    g. ▓▓▓**:** *Her husband is in here.*

    h. **Hammond:** *Really?*

    i. ▮▮▮▮: *Yes, and he says that his old lady will fucking testify that* ▮▮▮ *and all them motherfuckers are forcing her to do shit.*

23.    On the same day immediately following the previous call, ▮▮▮ made another call at 11:02 a.m. from the Sheridan City Jail to HAMMOND and continued to describe his interactions with W1's husband regarding W1. During the call, HAMMOND told ▮▮▮, *"Scott's calling me right now"* and ended the conversation shortly thereafter.

    a. ▮▮▮▮: *Anyway, I talked to dude, and uh, he just started telling me some things, he said yeah, my wife is the one that uh was in Perla and all that shit, told me everything.*

    b. **Hammond:** *Hey, yeah, Scott's calling me right now.*

    c. ▮▮▮▮: *Alright, well call and tell him I'm in here with dude… and I can get, and she's got our back if necessary and she'll testify against* ▮▮▮ *and them.*

24.    Toll records analysis of HAMMOND's cellphone records, phone number ▮▮▮ ▮▮▮▮ (Hammond's Phone) and FINKBEINER's cellphone records, ▮▮▮ ▮▮▮▮ (Finkbeiner's Phone), show that the Finkbeiner's Phone called Hammond's Phone two times while she was on the 11:02 a.m. call with ▮▮▮, who was detained in the Sheridan City Jail, which was consistent with statements made on that recorded call.

25.    Immediately after ending the recorded jail call with ▮▮▮, HAMMOND's toll records indicate that Hammond's Phone immediately called Finkbeiner's Phone, and the call lasted approximately 3 minutes and 45 seconds.

26.    At approximately 11:10 a.m., ▮▮▮ again called HAMMOND on a recorded call. At the beginning of the call, HAMMOND asked ▮▮▮ for W1's first and last name. ▮▮▮ can

be heard in the call asking W1's husband for W1's name. ████ then provides W1's first and last name to HAMMOND as directed.

27.     Later in the call, ████ asked HAMMOND, *"What did Scott say?."* To which, HAMMOND responded with *"That's fucking awesome"* and further described what FINKBEINER told her he would do for ████. HAMMOND stated, *"if you're on his side, he's on your side, he'll vouch for you, he'll do whatever he's got for you."*

   a.  ████ : *What did Scott say?*

   b.  **Hammond:** *He said that's fucking awesome, you know what I mean?*

   c.  ████ : *Tell him, uh, tell him he's welcome.*

   d.  **Hammond:** *Yeah, yeah, no, like he fucking, he already told me, he was like, he said, he'll testify for you in court, if he has to, whatever he has to do, like he's, he'll fucking, you know what I mean, he said but he's gotta get back, you know what I mean?*

   e.  **Hammond:** *You know what I mean, he's on your side, just like, if you're on his side, he's on your side, he'll vouch for you, he'll do whatever he's got for you.*

28.     The below chart illustrates the above outlined telephone calls between ████ , originating from the Sheridan City Jail, and Hammond's Phone, followed by the calls from Finkbeiner's Phone to Hammond's Phone, Hammond's Phone returning FINKBEINER's call, followed by ████ return call to Hammond's Phone.

12

| Central Time | Duration | Originating Number | Terminating Number | Source -Tolls |
|---|---|---|---|---|
| 5/12/24 11:00 | 2:05 | Sheridan City Jail | Hammond's Phone | |
| 5/12/24 11:02 | 0:45 | Sheridan City Jail | Hammond's Phone | |
| 5/12/24 11:03 | 0:00 | Finkbeiner's Phone | Hammond's Phone | |
| 5/12/24 11:03 | 0:03 | Finkbeiner's Phone | Hammond's Phone | |
| 5/12/24 11:03 | 3:44 | Hammond's Phone | Finkbeiner's Phone | |
| 5/12/24 11:10 | 2:21 | Sheridan City Jail | Hammond's Phone | |

29.    On May 14, 2024,       called HAMMOND on a recorded jail call. In that call, HAMMOND instructed       to provide W1's phone number and further discusses logistics with       and W1's husband regarding how to obfuscate the reason for W1 making a statement to FINKBEINER's attorneys, in exchange for HAMMOND posting bond for W1's husband.

   a. **Hammond:** *Okay, listen, I need that girl's phone number, and listen, I also need the next time, I need them to uh, you know like, I need to know that the reason that she wants him... as soon as we get her number, and she talks to the lawyers, he is out. Like, I'm gonna come, I'm gonna bond him out, and you know what I mean, but I need her to reassure the lawyers that it's over safety reasons. The reason she wants it, like this is not a deal to get him out, this is that she wants him out because of safety factors. You know what I mean, she is scared for her safety, and that's why she wants him... and I need her to convince the lawyers of that, okay?... Okay, but I need her phone number and the lawyers are going to contact her.*

30.    During the call,       gives the phone to W1's husband. HAMMOND again requests W1's number from W1's husband and, referring to FINKBEINER's attorneys, says, *"I think they got the address"* then that she needs W1 *"to reassure them, and I need you to be very careful what you say because they will go back and listen to what y'all talk about on here."* W1's

13

husband tells HAMMOND that he did not think W1 would speak on the phone. HAMMOND responded as outlined below.

> a. **Hammond:** *Okay, well that's fine, I just need her to reassure the lawyers that the reason she wants you out is for safety purposes... If you give me her number, I'll call her first.*

31.    In the same call, HAMMOND goes on to specifically reiterate to W1's husband that as soon as W1 provides a statement to FINKBEINER's attorneys, in which W1 tells them she was coerced and wants W1's husband out for safety reasons, HAMMOND would facilitate paying his bond.

32.    W1's husband provided W1's phone number directly to HAMMOND, and HAMMOND tells him *"If I can talk to her and she does everything I said, I'll have you out tomorrow."* During the conversation, W1's husband again expresses concern that W1 may not talk on the phone. HAMMOND indicates that if she needs to meet her in person, she will, and further states as outlined below.

> a. **Hammond:** *this is very crucial if what she says is true then, or even vice versa, even if she's... but I need her to write a statement to the lawyers, not to anybody else other than the lawyers, and then this is over and I've got your back, I've got ▇▇▇▇ back...I've got... you know what I mean, everybody is going to be... it's going to be a lot better.*

33.    On same recorded call, W1's husband again tells HAMMOND that he did not think W1 would make any statements or listen to anyone but him. HAMMOND responds by telling W1's husband, *"Then you need to tell her on the fucking phone that she needs to listen to me, or fucking*

14

*she's fucked. And so are you."* HAMMOND then, again, reiterates that she will facilitate W1's husband's release in exchange for W1's written statement to FINKBEINER's attorneys.

      a. **W1's Husband:** *The whole thing is though, is that she's not gonna listen to no, she's not gonna listen to nobody else but me on this right here, because she's already worried.*

      b. **Hammond:** *Then you need to tell her on the fucking phone that she needs to listen to me, or fucking she's fucked. And so are you. You won't get out, I can get you out tomorrow, if she will just listen to me.*

      c. **W1's Husband:** *If you could get me out before then, then it would be better.*

      d. **Hammond:** *I can't. I literally can't do it until... here's the deal, I can't do it until she fucking writes a statement to the lawyers. I can't. I don't have that much money, but I will bond... I will find for you... but until she writes a statement to them, I can't do it.*

34.    W1's husband passes the phone to     where HAMMOND then states:

      a. **Hammond:** *Tell him, 'I'm sorry', I don't know what to say. If she won't do... if she won't at least write a statement, she can recant on it, it doesn't matter because what that does is discredit her credibility.*

35.    HAMMOND then goes on to say to     , that she now has W1's phone number and will call or meet her in person soon to try to convince her to write a statement in exchange for W1's husband's release.   On the call,     suggests that HAMMOND reassure W1 of her safety, and HAMMOND responds that *"Oh yeah, she's totally safe, because that's tampering with a federal witness."*

15

    b. ▮▮▮▮: *Yeah, you need to let her know that she's gonna be safe and everything, you know what to say.*

    c. **Hammond:** *Oh yeah, she's totally safe, because that's tampering with a federal witness, and no, she's totally safe. But I will talk to her and if this all goes well, then I will have him out tomorrow.*

36.      On the same call, HAMMOND reiterates to ▮▮▮▮ that after *"this all goes well"* she will have W1's husband out the next day, the prosecution will be *"devastated"* and as soon as FINKBEINER is *"back into play,"* FINKBEINER said, *"he will testify in any aspect"* for ▮▮▮▮.

    a. ▮▮▮▮: *You need to let her know that she's going to be safe.*

    b. **Hammond:** *I will talk to her and if this all goes well, then I will have him out tomorrow.*

    c. ▮▮▮▮: *OK, well let her know, if she can help us then he's coming home and you're going to get him tomorrow.*

    d. **Hammond:** *And not only that, that you will be... you know what I mean, they might sit on it for a couple weeks because they're devastated but as soon as he's back into play, our friend or whatever, then he said he would testify in any aspect for you, on your behalf.*

37.      ▮▮▮▮ goes on to reassure HAMMOND that he knows FINKBEINER will look out for him. ▮▮▮▮ then asks HAMMOND for commissary funds, HAMMOND tells ▮▮▮▮ she doesn't have the money, to which ▮▮▮▮ replies for her to *"tell Mr. Good Guy"* to add money to his account for food. HAMMOND then indicates that W1's Husband's bond will be increasing, and that is "*not just gonna be written off, that's gonna be paid by my old friend."*

16

a. **Hammond:** *When he gets back into whatever, you know what I mean, then he's got way more, you know, whatever.*

b. ▮▮▮: *Yeah I know, I know he'll look out for me.*

c. ▮▮▮: *Can you put some money on my commissary for me? ... How much can you do?*

d. **Hammond:** *Not much because I'm broke as fuck, and I got fired yesterday.*

e. ▮▮▮: *Well, tell Mr. Good Guy that he can, fucking, up some food for me.*

f. **Hammond:** *Well, here's the thing, they're gonna be upping that dude's bond.*

g. ▮▮▮: *Oh yeah yeah okay.*

h. **Hammond***: Yeah, so keep in mind... that's not just gonna be written off, that's gonna be paid by my old friend.*

38.     It is this affiant's belief that the following statements made by HAMMOND on the referenced May 14, 2024, jail call clearly convey HAMMOND's intent to influence W1 into producing a conflicting written statement for FINKBEINER's attorneys, regardless of the veracity of that statement, in order to negatively affect the credibility of W1 as a witness in a federal proceeding.

a. **Hammond to W1's Husband:**

   i. *I need you to be very careful what you say because they will go back and listen to what y'all talk about on here.*

   ii. *You need to tell her on the fucking phone that she needs to listen to me, or fucking she's fucked.*

   iii. *this is very crucial if what she says is true then, or even vice versa, even if she's...*

17

b. **Hammond to** ▮▮▮▮▮ **:**

    iv. *as soon as we get her number, and she talks to the lawyers, he is out.*

    v. *she can recant on it, it doesn't matter because what that does is discredit her credibility.*

39.    Following the recorded jail call on May 14, 2024, toll records analysis show Finkbeiner's Phone and Hammond's Phone exchanged three phone calls at 4:05 p.m., 4:16 p.m. and 8:43 p.m., lasting approximately 5 minutes 53 seconds, 27 seconds, and 5 minutes and 12 seconds, respectively. Less than one minute after completing the 8:43 p.m. phone call with Finkbeiner's Phone, Hammond's Phone immediately called W1's phone. W1 reported, corroborated by toll analysis, that after the phone call from Hammond's Phone was unsuccessful, Hammond's Phone immediately texted the following statement to W1 (highlighted in yellow below): *"Hey your husband wanted me to get in touch with you give me a call."*

40.    Within the same minute that Hammond's Phone sent that text message to W1, Hammond's Phone called Finkbeiner's Phone for 10 minutes and 43 seconds, then Finkbeiner's Phone called Hammond's Phone for another 4 minutes and 23 seconds. During the 10-minute phone call, W1 attempted to return the missed call from Hammond's Phone.

41.    It is this affiant's belief, given the recorded statements made by HAMMOND, W1's reporting, and the timing, duration and volume of calls between Hammond's Phone and Finkbeiner's Phone immediately surrounding HAMMOND's contact with W1, that FINKBEINER was aware of HAMMOND's attempts to influence W1 on his behalf.

| Central Time | Duration | Originating Number | Terminating Number | Source -Tolls |
|---|---|---|---|---|
| 5/14/24 14:38 | 11:56 | Sheridan City Jail | Hammond's Phone | █████ |
| 5/14/24 16:05 | 5:53 | Finkbeiner's Phone | Hammond's Phone | █████ |
| 5/14/24 16:16 | 0:27 | Hammond's Phone | Finkbeiner's Phone | █████ |
| 5/14/24 20:43 | 5:12 | Finkbeiner's Phone | Hammond's Phone | █████ |
| 5/14/24 20:49 | 0:09 | Hammond's Phone | W1's Phone | █████ |
| 5/14/24 20:50 | SMS | Hammond's Phone | W1's Phone | █████ |
| 5/14/24 20:50 | 10:43 | Hammond's Phone | Finkbeiner's Phone | █████ |
| 5/14/24 20:56 | 0:01 | W1's Phone | Hammond's Phone | █████ |
| 5/14/24 20:56 | 0:01 | W1's Phone | Hammond's Phone | █████ |
| 5/14/24 21:01 | 0:00 | Finkbeiner's Phone | Hammond's Phone | █████ |
| 5/14/24 21:01 | 4:23 | Finkbeiner's Phone | Hammond's Phone | █████ |

42.   In a jail call from ████ to HAMMOND on May 15, 2024, HAMMOND told ████ to provide W1's address since W1 did not answer the phone. ████ provided W1's address to HAMMOND as directed. HAMMOND again reiterated on the call that once W1 does what HAMMOND asks, she will facilitate paying the bond for W1's husband. HAMMOND says that FINKBEINER will put up the money and HAMMOND will put her name on it.

  a.   **HAMMOND:** *Our friend is going to put up the money, I'm going to put my name on it, so tell him* [W1's Husband] *not to fuck around cuz I'd hate to have to kill him.*

43.    Less than one minute after ending the May 15, 2024, jail call with           ,
Hammond's Phone made a phone call to Finkbeiner's Phone lasting approximately 12 minutes and
32 seconds.

44.    In a jail call from           to Hammond's Phone on May 17, 2024,           left a
voicemail message identifying himself and providing the contact phone number for a family
member of W1.           indicated in the voicemail that the phone number would be another way
to reach W1 by phone.

45.    Later in the day on May 17, 2024, Finkbeiner's Phone made a call to Hammond's
Phone lasting approximately 7 minutes and 24 seconds. Immediately after ending that call with
Finkbeiner's Phone, Hammond's Phone attempted an unsuccessful call to W1, then called the
number for a family member of W1, provided by           , which was also unsuccessful.
Immediately following the two unsuccessful calls, Hammond's Phone called Finkbeiner's Phone.
The family member of W1 returned the missed call from Hammond's Phone, in which
HAMMOND identified herself and provided contact information for W1's family member to give
to W1, indicating it was regarding a legal matter.

| Central Time | Duration | Originating Number | Terminating Number | Source-Tolls |
|---|---|---|---|---|
| 5/17/24 13:04 | 0:33 | Sheridan City Jail | Hammond's Phone | |
| 5/17/24 13:06 | 0:05 | Sheridan City Jail | Hammond's Phone | |
| 5/17/24 15:02 | 7:24 | Finkbeiner's Phone | Hammond's Phone | |
| 5/17/24 15:11 | 0:08 | Hammond's Phone | W1's Phone | |
| 5/17/24 15:12 | 0:46 | Hammond's Phone | W1's Family Phone | |
| 5/17/24 15:14 | 0:05 | Hammond's Phone | Finkbeiner's Phone | |
| 5/17/24 15:19 | 0:00 | Sheridan City Jail | Hammond's Phone | |
| 5/17/24 15:19 | 0:05 | Sheridan City Jail | Hammond's Phone | |
| 5/17/24 15:20 | 0:46 | W1's Family Phone | Hammond's Phone | |
| 5/17/24 15:43 | 1:26 | Finkbeiner's Phone | Hammond's Phone | |
| 5/17/24 16:08 | 8:47 | Sheridan City Jail | Hammond's Phone | |
| 5/17/24 16:21 | 2:58 | Finkbeiner's Phone | Hammond's Phone | |
| 5/17/24 16:49 | 0:15 | Finkbeiner's Phone | Hammond's Phone | |
| 5/17/24 16:50 | 1:00 | Finkbeiner's Phone | Hammond's Phone | |
| 5/17/24 18:15 | 3:11 | Sheridan City Jail | Hammond's Phone | |

21

46.     Through two consensually recorded phone calls from W1 to HAMMOND placed on May 22, 2024, W1 inquired what HAMMOND's previous calls were regarding. HAMMOND indicated she wanted to meet in person to discuss further, but eventually told W1 that it was regarding FINKBEINER. The two agreed to meet on May 23, 2024, at 3:00 p.m.

47.     Between the initial May 22, 2024, consensually monitored call from W1 to HAMMOND ending at 3:20 p.m. and the second call from W1 to HAMMOND which began at 3:22 p.m, toll records show that Hammond's Phone made a call to Finkbeiner's Phone lasting 1 minute and 46 seconds.

48.     After HAMMOND arranged a meeting in person with W1 for May 23, 2024, Hammond's Phone immediately made another call to Finkbeiner's Phone lasting 18 minutes, then exchanged another call later in the day lasting approximately 16 minutes and 36 seconds.

| Central Time | Duration | Originating Number | Terminating Number | Source-Tolls |
|---|---|---|---|---|
| 5/22/24 15:18 | 2:02 | W1's Phone | Hammond's Phone | |
| 5/22/24 15:20 | 1:46 | Hammond's Phone | Finkbeiner's Phone | |
| 5/22/24 15:22 | 6:16 | W1's Phone | Hammond's Phone | |
| 5/22/24 15:29 | 18:00 | Hammond's Phone | Finkbeiner's Phone | |
| 5/22/24 16:45 | 16:36 | Finkbeiner's Phone | Hammond's Phone | |
| 5/22/24 19:46 | 0:36 | Finkbeiner's Phone | Hammond's Phone | |

49.     On May 23, 2024, HAMMOND did not show up to the scheduled in person meeting at 3pm. W1 texted and conducted multiple consensually recorded calls between 3pm and approximately 6:30 p.m., to determine why HAMMOND had not shown up as agreed.

22

HAMMOND indicated she was working late and described her vehicle as ▮▮▮ ▮▮ ▮▮
▮▮▮. After approximately three hours of waiting, W1 cancelled the in-person meeting.
HAMMOND attempted to reschedule, but W1 refused. Toll records for Hammond's Phone show
that immediately after the final call where W1 cancelled the meeting, Hammond's Phone made a
call to Finkbeiner's Phone lasting approximately 12 minutes and 25 seconds.

### III.   ADDITIONAL WITNESS TESTIMONY

50.     A government witness (Witness 2, W2) with direct access to both HAMMOND and
FINKBEINER since FINKBEINER's arrest in November 2023 provided the following
information over multiple voluntary and recorded interviews with local law enforcement and FBI.

51.     W2 indicated that on multiple occasions throughout 2024, *and as recently as
December of 2024*, that FINKBEINER approached W2 and asked if W2 knew of any women that
intended to testify against him at his upcoming trial or would *"try to go against him on his case."*
W2 provided some names to FINKBEINER, and **FINKBEINER requested that W2 find the
women and *"persuade them not to."***

52.     W2 said that the reason he/she never reached out to the women was because W2
knew that following through on FINKBEINER's request could be a crime and *"it seemed a little
fucking shady."*

53.     W2 indicated that, following FINKBEINER's arrest, HAMMOND found a female
witness at FINKBEINER's request. The witness that HAMMOND told W2 about was a big
witness in FINKBEINER's case, according to HAMMOND. HAMMOND told W2 that
FINKBENER wanted HAMMOND to talk to the witness and try to convince her not to testify
because *"she was very significant to the case"* and that would be a *"home run for him."*

23

54. HAMMOND told W2 about her attempt to influence the female witness. W2 stated as outlined below during an interview.

   a. **W2: "**I know that she [HAMMOND] has told me that, you know, that she went and found somebody that was testifying against him, and she went to try to talk her out of it and try to make her say that it was a lie. That what she was saying wasn't true. And I know that she's gone and done that for him [FINKBEINER]."

55. W2 told this affiant that HAMMOND intended to persuade the female witness not to testify, to get her to say she was lying, or get her to say that she made it up because she was scared. HAMMOND told W2 that the witness intended to testify against FINKBEINER about something related to drugs or sex for drugs.

56. Based on conversations between W2 and HAMMOND, W2 opined that HAMMOND did not reach out to the witness on her own, but that *"FINKBEINER asked her to do it."* W2 indicated that the meeting with the female witness did not quite go the way HAMMOND wanted, because the witness decided not to change her story.

57. Additionally, and as outlined above, W2 has stated that FINKBEINER has repeatedly requested W2 to identify and influence potential witnesses on his behalf, *as recently as December of 2024*.

## IV.    ONGOING ATTEMPTS TO INTIMIDATE A FEDERAL WITNESS

58. On 01/21/2025, FINKBEINER appeared in Arkansas state court for a hearing regarding Arkansas state charges filed against him on or around April 2024. After the hearing concluded, FINKBEINER walked out of the courtroom with

'. While outside the courtroom, FINKBEINER and          had an interaction with Witness 3 (W3).

24

59.    On or after 01/21/2025, a video of the apparent court surveillance footage, with no audio, was posted on multiple Facebook pages. The video showed the interaction between FINKBEINER, ▮▮▮▮▮▮, and W3 and had a written description of what occurred. The video was posted along with the following caption:

> a.    *"We believe that public figures should be held accountable for their behavior. The following video displays how* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮*, [WITNESS 3], treats fellow* ▮▮▮▮▮▮ *and* ▮▮▮▮▮▮*. While the security cameras did not have audio capability, [WITNESS 3's] non-verbal communication speaks volumes. When we allow this behavior from our leaders, we diminish the progress of Hot Spring County in becoming a place people want to live and raise their families. This is the opposite of a level-headed, calm, and strong leader. This is unacceptable, and as long as there are people who care about this county getting better, things like this will not be swept under the rug to pacify adults who act like children".*

60.    The video stated that W3 arrived five minutes before the end of the hearing and referred to W3 as a *"Self-proclaimed FBI Informant."* The video later stated that W3 harassed FINKBEINER and ▮▮▮▮▮▮, who the video referred to as *"federal witnesses."* The video ended with the statement, *"The Feds and their informants will Stop at Nothing to keep our Sheriff out of office".*

61.    In a comment on the video, a Facebook account with the name "▮▮▮▮▮▮" posted the following, *"[WITNESS 3] told* ▮▮▮▮▮▮ *that he was going to record conversations with Sheriff Finkbeiner in exchange for a proffer with immunity for the FBI".*

62.    On the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ page, the Facebook account with the name ▮▮▮▮▮▮▮▮▮ described ▮ perspective of what occurred in the video in a comment, which stated:

a.    *[WITNESS 3] mouthed something at us [FINKBEINER and ▮▮▮▮] as he was walking out and I said, 'Hi ▮▮▮▮▮'. That seemed to set him off. Following that I told him that he needed to move out of my space and I put my hand up to maintain space. Then in an effort to deescalate the situation, I told him we were leaving. He continued to come back and try to get a reaction out of us. After the attorneys came out, [FINKBEINER] told his attorney that he thinks they need to get a restraining order against [WITNESS 3]. [WITNESS 3] continued to yell things that didn't quite make much sense. I do believe [FINKBEINER'S] attorneys are reporting this to the US Attorney's office as [FINKBEINER] and I are both federal witnesses in his case.*

63.    The Facebook account with the name ▮▮▮▮▮▮▮▮▮ also posted another comment, which stated:

a.    *We don't have to put any words in his mouth. [WITNESS 3] said enough when he told ▮▮▮▮▮▮▮▮▮ that he was going to record conversations with Sheriff Finkbeiner in exchange for a proffer with immunity with the FBI. He also let it slip to me once that his FBI codename is ▮▮▮▮▮▮▮. After that I knew exactly what to FOIA request from the FBI.*

64.    The **administrators** for the Facebook page where these comments were posted were **FINKBEINER,** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

65.    W3 was previously a Confidential Human Source (CHS) with the FBI. The FBI uses unique CHS names to protect personally identifiable information on internal documentation,

in preambles on consensual recordings, and occasionally in court proceeding when the CHS is not expected to testify. CHSs are often made aware of these unique identifiers. W3 was made aware of his/her CHS name, which was not "          ," but W3 misunderstood that name to be "          ."

66.     During the course of an investigation, W3 made a consensual recording on a device which was provided to the FBI without W3's ability to review or alter the file. The recording[5] was then turned over to FINKBEINER's defense team pursuant to rules of discovery and prior to the courthouse interactions or the referenced Facebook posts. In the recording, W3 stated in a preamble, what W3 understood to be his/her CHS name followed by the time and date, "

                                    ."

67.     The words "          " referred to the time in which the recording was being made and were not associated with W3's alleged CHS name or W3's relationship with the FBI in any way. Additionally, W3 told the FBI that W3 never understood "     or any numbers to be associated with his/her CHS name, and never disclosed the name "          " to          or anyone else.

68.     "          " was not the CHS name of W3, and thus would not appear anywhere in FBI systems associated with W3. Additionally, W3 was unable to review the content of the preamble recorded and did not understand when          referenced "     in his Facebook post.          knowledge of and reference to the specific combination of "          " and "    ," could have only come from his knowledge of the content of a recording provided pursuant to rules of discovery and protected under a court order.

_____

[5] The Affiant does not have access to the recording and was not involved in W3's limited actions as a CHS. However, the Affiant has confirmed with the assigned FBI Special Agents regarding only the stated initial contents of the recording.

69. ▮▮▮▮ addressing W3 as "▮▮▮▮" demonstrated that ▮▮▮▮ knew W3 had a relationship with the FBI. ▮▮▮▮ referring to "▮▮▮▮" on social media showed an intent to name W3 as an FBI witness or informant in the public forum and also showed that ▮▮▮▮ knew a detail about W3's relationship with the FBI that only could have come from exposure to discovery materials covered under a protective order.

70. It is this affiant's belief that ▮▮▮▮ use of and release of sensitive information regarding W3 were meant to intimidate W3 and negatively impact ▮ credibility as a witness. Additionally, ▮▮▮▮ and FINKBEINER both understand the potential impact of leaking sensitive information like a CHS name directly linked to W3 or sharing that information in a public forum. Both ▮▮▮▮ and FINKBEINER have had similar relationships with the FBI in the past, which included CHS names and clear admonishments regarding the sensitive nature of that type of information. This activity, which constituted willful violation of the protective order entered in FINKBEINER's pending federal prosecution, occurred on or after ▮▮▮▮, with the information still available on social media. This indicates that FINKBEINER and others on his behalf are, at the time of writing, actively and currently attempting to intimidate a potential federal witness.

## V.    CONCLUSION

71. Toll Records analysis of both Finkbeiner's Phone and Hammond's Phone show the devices exchanged over 857 phone calls in the period of time between February 2024 and August 2024. Since the recorded May 12, 2024 jail call where ▮▮▮▮ first told HAMMOND about an opportunity to influence the testimony of W1, the call volume between Finkbeiner's Phone and Hammond's Phone significantly increased. The number of calls exchanged in February was 44

28

calls, March (82 calls), April (36 calls), then in May, the call volume increased to 184 calls, June (212 calls), July (209 calls) and August (90 calls).

72. Additionally, many of the calls exchanged between Finkbeiner's Phone and Hammond's Phone coincide to within one minute of a recorded jail call with ▊▊▊▊, or a recorded conversation with W1, where HAMMOND received information or attempted to direct action to facilitate influencing the testimony or credibility of W1.

73. It is this affiant's belief based on multiple witness statements, the significant increase in call volume during the period, numerous explicit references on recorded calls by HAMMOND to FINKBEINER's knowledge and involvement in the attempts to influence W1, and the timing of many of the calls, that FINKBEINER, ▊▊▊▊, and HAMMOND all actively participated in a conspiracy and knowingly attempted to tamper with a witness in a federal judicial proceeding.

74. W2, a witness with direct access to both HAMMOND and FINKBEINER, said that FINKBEINER requested W2 to identify and influence potential witnesses on his behalf, *as recently as December of 2024*. Additionally, statements made in person and on social media (on a page administered by FINKBEINER), by a ▊▊▊▊▊▊ of FINKBEINER, leveraged information uniquely contained in discovery materials and covered under an order of protection, likely intended to intimidate or affect the credibility of a potential Federal witness *in January of 2025*.

75. It is this affiant's belief that, at the time of this writing, FINKBEINER is actively and currently participating in and directing attempts to identify and intimidate potential witnesses that may testify against him in his upcoming federal proceeding. Further, it is this affiant's belief that HAMMOND and ▊▊▊▊ have conspired with and directly participated with FINKBEINER

in his efforts to identify and intimidate potential witnesses that may testify against him in his upcoming federal proceeding.

76.    Based upon the foregoing facts, there is probable cause to believe that:

   a.    Beginning on an unknown date, but at least as early as May of 2024 and continuing through December of 2024, in the Western District of Arkansas, Hot Springs Division, and elsewhere, the Defendants, Derek Scott FINKBEINER, aka Scott Finkbeiner, Jordan HAMMOND, and ⬛⬛⬛⬛⬛, ⬛⬛⬛⬛⬛, and others known and unknown, did knowingly and intentionally combine, conspire, confederate and agree with each other, and with others known and unknown, to attempt to intimidate, threaten, and corruptly persuade federal witnesses with the intent to influence, delay, and prevent the testimony of witnesses in the federal prosecution proceedings now pending as and against the Defendant, Derek Scott FINKBEINER, aka Scott Finkbeiner, all in violation of Title 18, United States Code, Sections 1512(b)(1) and 1512(k);

   b.    Beginning on an unknown date, but at least as early as on or about May 12, 2024, through on or about May 23, 2024, in the Western District of Arkansas, Hot Springs Division, and elsewhere, the Defendants, Derek Scott FINKBEINER, aka Scott Finkbeiner, Jordan HAMMOND, and ⬛⬛⬛⬛⬛⬛⬛⬛, aiding and abetting each other, did knowingly and intentionally attempt to intimidate, threaten, and corruptly persuade a federal witness with the intent to influence, delay, and prevent the testimony of the federal witness in the federal prosecution proceedings now pending as and against the Defendant, Derek Scott FINKBEINER, aka Scott

Finkbeiner, all in violation of Title 18, United States Code, Section 1512(b)(1) and Title 18, United States Code, Section 2;

c.  That the Defendant, Derek Scott FINKBEINER, aka Scott Finkbeiner, was on release pursuant to an order dated November 3, 2023, from the United States District Court of the Western District of Arkansas, Case Number 6:23CR-60039-001, which order notified the Defendant, Derek Scott FINKBEINER, aka Scott Finkbeiner, of the potential effect of committing an offense while on pretrial release; and

d.  That, beginning on an unknown date, but at least as early as May of 2024 and continuing through December of 2024, the Defendant, Derek Scott FINKBEINER, aka Scott Finkbeiner, committed the offense of conspiring to tamper with a federal witness in violation of Title 18, United States Code, Sections 1512(b)(1) and 1512(k), and Title 18, United States Code, Section 3147(1).

77.    Therefore, I respectfully submit this Affidavit in support of a Criminal Complaint and pray that warrants be issued forthwith for the arrests of Derek Scott FINKBEINER, aka Scott Finkbeiner, Jordan HAMMOND, and ▆▆▆▆▆▆▆▆▆▆▆▆

Respectfully submitted,

/s/ *Brian Ambrose (telephonically)*
BRIAN AMBROSE
Special Agent
Federal Bureau of Investigation

Sworn to before me on this ___ day of February, 2025.

HON. BARRY A. BRYANT
United States Magistrate Judge
Western District of Arkansas

City and State: _____, Arkansas

32